**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| KATHY JO MIKESELL, | ) | CASE NO. 5:11-cv-775 |
| | ) | |
| Plaintiff, | ) | JUDGE GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |

Plaintiff, Kathy Jo Mikesell ("Plaintiff"), challenges the final decision of

Defendant, Michael J. Astrue, Commissioner of Social Security ("the Commissioner"),

denying her application for a Period of Disability ("POD") and Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 ("the

Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before

the undersigned United States Magistrate Judge pursuant to an automatic referral

under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth

below, the Magistrate Judge recommends that the Commissioner's final decision be

AFFIRMED.

## I.  PROCEDURAL HISTORY

On January 4, 2007, Plaintiff filed her application for a POD and DIB and alleged

a disability onset date of February 8, 2006.  (Tr. 10.)  Her application was denied initially and upon reconsideration, so she requested a hearing before an administrative law judge ("ALJ").  (Tr. 10.)  On October 27, 2009, an ALJ held Plaintiff's hearing.  (Tr. 10.) Plaintiff appeared, was represented by counsel, and testified.  (Tr. 10.)  A vocational expert ("VE") also appeared and testified.  (Tr. 10.)

On November 13, 2009, the ALJ found Plaintiff not disabled.  (Tr. 19.)  On February 16, 2011, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)  On April 20, 2011, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)

On October 7, 2011, Plaintiff filed her Brief on the Merits.  (Doc. No. 14.)  On December 12, 2011, the Commissioner filed his Brief on the Merits.  (Doc. No. 16.)  On December 27, 2011, Plaintiff filed her Reply Brief.  (Doc. No. 17.)

Plaintiff contends that the ALJ erroneously failed to address her fibromyalgia in his step two assessment of whether she suffered severe impairments, and that this failure also flawed every subsequent step of the ALJ's analysis.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was 48 years old on her alleged disability onset date and subsequently changed age categories to qualify as someone who was "closely approaching advanced age."  (Tr. 18.)  She has at least a high school education and is able to communicate in English.  (Tr. 18.)  She has past relevant work experience as a payroll clerk, warehouse

2

picker, and telemarketer, as well as in positions involving data entry, quality control, and microfilm.  (Tr. 18.)

### B.     Medical Evidence

Plaintiff's assignment of error relates to only her physical impairments and fibromyalgia; accordingly, the following summary of medical evidence is limited to only those impairments.

On February 8, 2006, Plaintiff injured herself while at work.  (Tr. 180, 229.)  On February 16, 2006, Plaintiff presented to Dr. James Martin, D.O., for an evaluation of her right shoulder.  (Tr. 294.)  Dr. Martin indicated that Plaintiff had been diagnosed with a right shoulder strain and sprain; had attended physical therapy; exhibited symptoms of radiculitis; and would need MRIs of her cervical spine and right shoulder. (Tr. 294.)

On March 9, 2006, Plaintiff underwent a one-time Workers' Compensation evaluation by Dr. Scot D. Miller, D.O., primarily regarding her shoulder injury.  (Tr. 176-78.)  Dr. Miller indicated the following.  Plaintiff had "a multitude of complaints that are difficult to sort out," including a "heavy head," "tongue difficulties," "occasional vision changes," "overall weakness," an asymmetric jaw, neck pain, shoulder pain, numbness in her arms, and left knee pain.  (Tr. 176.)  Plaintiff's gait and station were normal; and she had "minimal restriction or pain reproduction" in the range of motion of her hips, knees, ankles, shoulders, elbows, and wrists.  (Tr. 177.)  An MRI of her cervical spine revealed multilevel degenerative disc disease, with degenerative changes at C5-6 and C6-7.  (Tr. 178.)  Plaintiff had a normal sensory and motor examination of the upper and lower extremities, although she had limited cervical mobility secondary to

3

discomfort, as well as limited right shoulder mobility.  (Tr. 177.)  Dr. Miller further

indicated that Plaintiff had undergone a shoulder MRI, but he declined to review it

because shoulder injuries were outside his specialty.  (Tr. 178.)

On March 20, 2006, Plaintiff returned to Dr. Martin.  (Tr. 180-82.)  Dr. Martin

indicated the following.  Plaintiff had been diagnosed with a right shoulder sprain,

although an MRI of her shoulder "showed [a] possible partial supraspinatus tendon tear

and some degenerative changes in the AC joint."  (Tr. 180.)  Plaintiff presented with "a

17-page handwritten detailing of her multiple complaints," but "[m]any of the complaints

that [Plaintiff] brings up in the 17 pages do not appear to have [a] basis in [the]

structural or physiological facts given in her stated injury."  (Tr. 180.)  Upon physical

examination, Dr. Martin noted that Plaintiff had "fairly good range of motion of the right

shoulder, but there is tenderness on full abduction and circumduction."  (Tr. 181.)  Dr.

Martin "assured [Plaintiff] . . . that it does not appear that there is any severe or surgical

problem with her neck or shoulder[,] that it appears that there are some degenerative

changes in her cervical spine[,] and that at the very most, she has a partial tear of her

supraspinatus tendon."  (Tr. 180.)  Dr. Martin concluded that the "[a]llowed diagnosis in

this case" was a right shoulder sprain.  (*See* Tr. 180, 181.)

On April 7, 2006, Plaintiff presented to Dr. Selwyn-Lloyd McPherson, M.D., for a

neuromuscular examination regarding her right shoulder pain.  (Tr. 226-29.)  Dr.

McPherson indicated that Plaintiff presented with a history of a right shoulder strain,

and that "[i]t was extremely difficult to evaluate [Plaintiff's] right shoulder due to the

inconsistent findings."  (Tr. 226.)  Dr. McPherson explained that "[a]t various times

during the evaluation, [Plaintiff's] shoulder examination was normal," but "when

[Plaintiff] was made aware that her shoulder was being examined, she complained of severe pain with a severe decrease in range of motion."  (Tr. 226.)  Dr. McPherson opined that Plaintiff required aggressive physical therapy; however, Dr. McPherson noted that Plaintiff indicated she had already undergone physical therapy and that it only made her symptoms worse.  (Tr. 226, 229.)  Dr. McPherson further noted that Plaintiff "is currently convinced that she has a severe medical condition," and that "it will be very difficult to convince [her] otherwise."  (Tr. 226.)

On April 14, 2006, Plaintiff presented to Dr. Sushil M. Sethi, M.D., for an independent medical examination to determine whether she suffered an industrial injury, whether she needed additional treatment for her "allowed diagnosis"; and whether there were any further recommended diagnoses.  (Tr. 259-63.)  Dr. Sethi concluded that Plaintiff's right shoulder strain and sprain had resolved.  (Tr. 262.)

On May 5, 2006, Plaintiff underwent a nerve conduction study and needle EMG on her upper extremities.  (Tr. 232.)  The studies were normal.  (Tr. 232.)

On July 25, 2006, Plaintiff presented to Dr. Richard N. Kepple, M.D., for a consultative examination to determine whether Plaintiff should also be diagnosed with a cervical strain and trapezius strain.  (Tr. 254-57.)  Dr. Kepple indicated the following. Plaintiff "manifested numerous pain behaviors during [the] interview and examination." (Tr. 256.)  For example, "[s]he held her entire body in a rigid posture," although "this was not evidenced when observed walking to her car."  (Tr. 256.)  Also, "[s]he groaned and grimaced with every movement, and light touch anywhere produced a magnified response."  (Tr. 256.)  Further, "[d]uring the examination, she voluntarily restricted range of motion of both shoulders and of her neck."  (Tr. 256.)  Based on Plaintiff's

5

medical documentation, however, Dr. Kipple declined to allow Plaintiff any further diagnoses.  (Tr. 256-57.)

On April 12, 2007, Plaintiff presented to Dr. Raphael A. Arqueta, M.D., upon referral from the Bureau of Disability Determination for an evaluation of Plaintiff's complaints of right shoulder pain, neck pain, and back pain.  (Tr. 321-23.)  Dr. Arqueta indicated that Plaintiff reported the following.  Plaintiff had an MRI that showed a torn rotator cuff.  (Tr. 321.)  Her right shoulder pain radiated to her jaw and upper back.  (Tr. 321.)  She rated her neck pain and shoulder pain at 12 on a scale between 1 and 10 in severity when she was engaged in any activities, and between 4 and 6 when she was inactive.  (Tr. 321.)  Plaintiff also had "shooting" and "aching" pain in her mid-back that radiated into both of her legs, which she rated at between 8 and 9 out of 10 in severity when she was active, and between 5 and 6 out of 10 when she was inactive.  (Tr. 321.)  Also, her right leg sometimes became numb when she walked for less than half an hour.  (Tr. 321.)  She took pain medication daily, but only when her pain was severe because she was afraid the medication would make her drowsy and interfere with her ability to drive.  (Tr. 321.)

Dr. Arqueta indicated the following upon physical examination.  Plaintiff's straight-leg tests were negative.  (Tr. 323.)  Her AC joint all around the deltoid, as well as her upper neck in the upper trapezius muscle on the right, were tender; however, there were no muscle spasms.  (Tr. 323.)  Also, Plaintiff's mid-lumbosacral area of her back, extending to the sciatic notch, was moderately tender.  (Tr. 323.)  Her neurological exam was exam was grossly intact.  (Tr. 323.)

Dr. Arqueta opined that Plaintiff's "right shoulder injury and pain would limit her to

6

do lifting, pushing or pulling items of five pounds and . . . only for a brief period of time
not exceeding five minutes."  (Tr. 323.)  Further, "[s]tanding, walking or sitting is also
difficult for her due to the chronic back pain and neck pain," and "[t]raveling because of
the above complaints would be affected."  (Tr. 323.)

On February 2, 2009, Plaintiff presented to Dr. Andrew C. Raynor, M.D., upon
referral from Dr. Lefkovitz regarding Plaintiff's positive test results of "anti-nuclear
antibody associated with arthralgias and myalgias."  (Tr. 397.)  Dr. Raynor indicated the
following.  Plaintiff reported fatigue, photosensitivity, intermittent chest pain, nausea,
intermittent lower abdominal pain, occasional bruising, recurrent headaches since 2006,
generalized muscle pain, right arm weakness, paresthesias in her hands and feet, and
joint pain.  (Tr. 397.)  She denied back and neck pain, sciatica, and any need to use a
cane or walker.  (Tr. 397.)  Upon physical examination, Dr. Raynor reported that Plaintiff
had mild limitation in her range of motion in her cervicolumbar spine, and that "there is
trigger point tenderness."  (Tr. 398.)  Among Dr. Raynor's diagnoses was fibromyalgia,
which he noted "appears to be primary diagnosis."  (Tr. 398.)  However, Dr. Raynor did
not express any further opinions about Plaintiff's fibromyalgia and instead indicated that
Dr. Lefkovitz would evaluate Plaintiff's paresthesias and other neuropathic symptoms.
(Tr. 399.)

On October 2, 2009, Dr. Lefkovitz authored a medical opinion of Plaintiff's ability
to perform work-related activities and indicated the following.  (Tr. 433-36.)  Plaintiff
could lift and carry less than 10 pounds occasionally and frequently; sit for about 4
hours in an 8-hour day with normal breaks; and stand and walk for less than 2 hours in
an 8-hour day with normal breaks.  (Tr. 433.)  She could sit and stand for 20 minutes at

7

a time before she needed to change positions.  (Tr. 343.)  She needed to walk every 30 minutes for 10 minutes at a time.  (Tr. 434.)  She needed to be able to "shift at will from standing/walking," and lie down at unpredictable intervals.  (Tr. 434.)  These limitations could be expected to affect Plaintiff every day.  (Tr. 434.)  Her cervical spine spondylosis and fibromyalgia contributed to these limitations.  (Tr. 434.)

Dr. Lefkovitz further indicated the following.  Plaintiff could occasionally twist and climb stairs; but she could never stoop or bend, crouch, or climb ladders.  (Tr. 435.)  Her abilities to reach, handle, push, and pull were affected by her impairments.  (Tr. 435.)  She should avoid concentrated exposure to hazards such a machinery and heights; moderate exposure to humidity, noise, fumes, odors, dust, gases, and poor ventilation; and all exposure to extreme cold, extreme heat, and wetness.  (Tr. 435.)  Plaintiff could be expected to be absent from work more than three times a month.  (Tr. 436.)

On March 2, 2009, Plaintiff returned to Dr. Raynor, and Dr. Raynor's evaluation essentially remained the same.  (*See* Tr. 289-91.)  On June 2, 2009, Plaintiff returned to Dr. Raynor for a follow up on her osteopenia, osteoarthritis, fibromyalgia, and "positive antinuclear antibody."  (Tr. 381.)  Regarding, Plaintiff's fibromyalgia, Dr. Raynor indicated only that Plaintiff "[c]ontinues pain management with Dr. Lefkowitz." (Tr. 381.)

### C.    Hearing Testimony

#### 1.    Plaintiff's Hearing Testimony

Plaintiff testified at her hearing as follows.  Plaintiff is right-hand dominant.  (Tr.

8

51.)  On February 8, 2006, she injured her right shoulder and neck while working.  (Tr. 46-47.)  Her shoulder and neck pain were her "biggest physical problem," particularly her neck.  (Tr. 48.)  The pain manifested itself around the collarbone and shoulder blade, as well (Tr. 47); and she suffered headaches from moving her head (Tr. 57).

Sleeping aggravated her neck pain, apparently because her neck did not have sufficient support while she was lying down.  (Tr. 49.)  The pain interfered with her ability to sleep.  (Tr. 49.)  Plaintiff awoke with pain in her shoulder and neck every day, and her pain sometimes made her feel nauseous.  (Tr. 48, 50.)  Accordingly, she continued to wear a soft-collar neck brace.  (Tr. 48.)

Plaintiff took Vicodin for her pain, although it interfered with her ability to sleep.  (Tr. 49-50.)  She also took Cymbalta for depression; and other medication to help her sleep, to reduce inflamation, and for her fibromyalgia.  (Tr. 50.)  Her fibromyalgia medication did not fully relieve her pain.  (Tr. 50.)

In addition to her pain in her right shoulder, Plaintiff also suffered "numbness" and "coolness" in her right arm; accordingly, she tried to use her left hand as often as possible.  (Tr. 51.)

Plaintiff was able to write checks or sign documents, but she could not lift her arm too high without causing pain.  (Tr. 54.)  Using a computer aggravated her pain, and she had to take breaks from using computers "a lot"—for example, she would "try to only do two bills at a time."  (Tr. 54.)

Plaintiff associated her shoulder and neck pain to her diagnosis of fibromyalgia.  (Tr. 54.)  Dr. Lefkovitz treated Plaintiff for her fibromyalgia, and Plaintiff took Lyrica for the condition.  (Tr. 55.)  She still experienced fibromyalgia-related symptoms when she

9

walked. (Tr. 55.) She did not use a cane or walker to assist her walking because it caused pain in her collarbone. (Tr. 55.)

Plaintiff could bathe and dress herself. (Tr. 59.) She could walk for only 10 minutes before she needed to stop and rest. (Tr. 55.) Although Plaintiff could go shopping by herself if it was necessary, she usually went shopping with others who could help her. (Tr. 53.) If she went shopping by herself, she often requested assistance from people in the store. (Tr. 53.) She used motorized carts as often as possible "because otherwise it's just too painful." (Tr. 53.) If no motorized carts were available, she would lean on a push cart. (Tr. 55-56.)

Plaintiff was able to drive and drove herself to her appointments with doctors. (Tr. 53.) She did not believe it was safe for her to drive on the highway, however, because her pain and limited range of motion in her neck prevented her from being able to observe traffic thoroughly; therefore, she limited herself to driving on "back roads" where she could drive slower. (Tr. 52.) She also had a handicapped parking permit, which Dr. Lefkovitz gave her. (Tr. 53.)

Plaintiff could sit for only 20 or 30 minutes before she needed to "stretch or move." (Tr. 56.) She could not do laundry, cook, or clean dishes without assistance and regular breaks. (Tr. 56-57.)

Plaintiff also suffered fatigue; for example, although she might not feel particularly tired when she lied down, if she used a heat pad she would fall asleep without realizing it. (Tr. 58.) Nevertheless, she believed that her shoulder, neck, and back pain prevented her from working. (Tr. 60.)

10

## 2.    Vocational Expert's Hearing Testimony

The ALJ posed the following hypothetical to the VE:

I'd like you to assume an individual 48 to 51 years of age with a 12th-grade education and the [claimant's] past relevant work . . . .  And I'd like you to assume that this hypothetical person is limited to light work which involves lifting and carrying; pushing, pulling 20 pounds occasionally, 10 pounds frequently.  This person would be able to stand and walk a total of about six hours in eight, and . . . sit a total of about six hours in eight. This hypothetical individual could never climb no [sic] ladders, ropes, or scaffolds, and there is to be no overhead work with the dominant right arm. This person should avoid exposure to dangerous unprotected heights and machinery, and . . . should be limited to simple, routine tasks.

(Tr. 65-66.)  The VE testified that such a person could perform Plaintiff's past work as a payroll clerk.  (Tr. 66.)  The ALJ then limited his hypothetical person to be unable to perform skilled or semi-skilled work.  (Tr. 66.)  The VE responded that such a person could not perform Plaintiff's past work.  (Tr. 67.)

The VE further testified that the ALJ's hypothetical person could perform other work as a cashier (for which there were 16,300 jobs in northeast Ohio, 69,100 jobs in Ohio, and 1,553,760 jobs in the nation), bench assembler (for which there were 8,588 jobs in northeast Ohio, 49,200 jobs in Ohio, and 691,700 jobs in the nation), and gasket inspector (for which there were 4,000 jobs in northeast Ohio, 17,000 jobs in Ohio, and 280,000 jobs in the nation).  (Tr. 68-69.)  The VE continued that her proffered jobs were only examples and not the only jobs that such a person could perform, and that her testimony was consistent with the Dictionary of Occupational Titles ("DOT").  (*See* Tr. 69.)

The ALJ thereafter asked whether the hypothetical person could perform any other work if she were able to push and pull no more than 5 pounds for 5 minutes at a

11

time with her right-dominant hand.  (Tr. 69-70.)  The VE responded that such a person would not be able to perform any jobs.  (Tr. 70.)

Plaintiff's counsel declined to question the VE further, as he believed the ALJ's third hypothetical addressed the restriction with which counsel was concerned.  (Tr. 70.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905

F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a

severe impairment that is expected to last for at least twelve months, and the

impairment meets a listed impairment, the claimant is presumed to be disabled

regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and*

416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her

past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*

416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does

prevent her from doing her past relevant work, if other work exists in the national

economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§

404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  Ms. Mikesell meets the insured status requirements of the Social Security Act through December 31, 2010.

2.  Ms. Mikesell has not engaged in substantial gainful activity since February 8, 2006, the alleged onset date.

3.  Ms. Mikesell has the following severe impairments: degenerative changes and supraspinatous tendon degeneration in the right acromioclavicular joint (shoulder) and depression.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that Ms. Mikesell has the residual functional capacity to perform a range of light work . . . .  Specifically, she can lift, carry, push and pull 20 pounds occasionally and ten pounds frequently.  She can sit for six hours and stand for and/or walk for six hours in a normal workday.  She cannot climb ladders, ropes, or scaffolds.  She cannot reach

13

overhead with her dominant right arm. She cannot work at unprotected heights, around dangerous machinery, or around workplace hazards.  She is limited to simple, routine tasks.

6.    Ms. Mikesell is unable to perform any past relevant work.

. . . . .

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Ms. Mikesell is "not disabled," whether or not she has transferable job skills.

10.    Considering Ms. Mikesell's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform.

11.    Ms. Mikesell has not been under a disability, as defined in the Social Security Act, from February 8, 2006 through the date of this decision.

(Tr. 12-19.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir.

14

1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

The burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.  *Shinseki v. Sanders*, 556 U.S. 396, 129 S. Ct. 1696, 1706 (2009).

## B.      The ALJ's Assessment of Plaintiff's Fibromyalgia

The ALJ did not discuss Plaintiff's fibromyalgia in his step two assessment of whether Plaintiff suffered severe impairments.  Plaintiff contends that this failure, in addition to being error, flawed every subsequent step of the ALJ's analysis.  For the following reasons, these contentions are not well taken.

Plaintiff was diagnosed with fibromyalgia on February 2, 2009, by Dr. Raynor.  Although Dr. Raynor noted that Plaintiff exhibited multiple trigger points and diagnosed Plaintiff with fibromyalgia, he offered no opinions of the extent to which Plaintiff was limited by her fibromyalgia; rather, he indicated that Dr. Lefkovitz assessed and treated Plaintiff.  Dr. Lefkovitz is a treating source and rendered opinions of the extent to which

15

Plaintiff was limited in part by her fibromyalgia, but the ALJ gave Dr. Lefkovitz's

opinions little weight for four reasons:

- Dr. Lefkovitz's opinions were inconsistent with Plaintiff's reported activities of daily living;[1]

- Dr. Leftkovitz's opinions were internally inconsistent;[2]

- Dr. Lefkovitz's opinions were not supported by objective test results;[3] and

- Dr. Lefkovitz's opinions were inconsistent with his treatment notes.[4]

(Tr. 17.)  Further, although Plaintiff attributed her right shoulder pain, neck pain, and

trouble walking in part to her fibromyalgia, the ALJ found Plaintiff not entirely credible

because several of her statements to physicians, as well as her testimony, were

inconsistent.[5]  (Tr. 15-16.)

---

[1] The ALJ found that Dr. Lefkovitz's opinion that Plaintiff could never stoop, bend, or crouch was exaggerated and inconsistent with Plaintiff's admitted activities including taking care of a puppy and riding in an automobile, which required stooping.  (Tr. 17.)

[2] The ALJ found that Dr. Lefkovitz's opinion that Plaintiff required walking for 30 minutes after every 10 minutes of being stationary was inconsistent with his contemporaneous opinion that Plaintiff could walk less than 2 hours in an 8-hour workday, as walking for 30 minutes after every 10 minutes would total more than 2 hours of walking in an 8-hour workday.  (Tr. 17.)

[3] The ALJ found that testing "showed little in the way of physiologic abnormalities."  (Tr. 17.)

[4] The ALJ found that all of Dr. Lefkovitz's diagnostic testing was normal or nearly normal; most of Plaintiff's clinical signs were not positive and were inconsistent with Plaintiff's complaints; and Dr. Lefkovitz never restricted Plaintiff's activities in the normal course of medical treatment.

[5] The ALJ found that Plaintiff's daily activities belied Plaintiff's subjective statements of the extent to which she was limited.  (Tr. 16.)  Specifically, the ALJ found that the evidence showed Plaintiff could drive her children to school, prepare meals, shop, care for pets, perform self-care, do laundry, do dishes,

16

As an initial matter, Plaintiff has not taken issue with the ALJ's assessment of Dr. Lefkovitz's opinions or Plaintiff's credibility except to contend that the ALJ did not consider the diagnosis of fibromyalgia and that, if he had, his credibility assessments would have been more favorable.  This contention lacks merit for three reasons.  First, it is conclusory.  Second, Plaintiff provides no basis to conclude that any failure to mention the diagnosis of fibromyalgia was harmful, as the mere diagnosis of an impairment does not indicate the severity of that impairment.  *See Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990) ("This court has determined that a claimant must do more to establish a disabling mental impairment than merely show the presence of a dysthymic disorder."); *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988) (explaining that signs of arthritis are not enough; the claimant must show that the condition is disabling).  Third, the ALJ considered Plaintiff's fibromyalgia, as the ALJ:  noted that Plaintiff alleged in her application for disability benefits that she suffered fibromyalgia; discussed Plaintiff's testimony attributing, at least in part, her alleged right shoulder pain, neck pain, and walking limitations to her fibromyalgia; and thoroughly assessed Dr. Lefkovitz's opinions, which were based in part on Plaintiff's fibromyalgia.  (Tr. 14, 17.)

---

handle a savings account, use a checkbook, socialize with family, and attend church.  (Tr. 16.)  The ALJ further found the following.  Plaintiff initially denied side effects from medications, although she later alleged that her medication made her drowsy; she was able to hand-write a seventeen-page letter describing her alleged symptoms despite claiming problems with her hands; although she made numerous complaints of blackouts, testing regarding this problem was normal; and she misrepresented to Dr. Arqueta that she had a torn rotator cuff, as there is no objective or diagnostic evidence that Plaintiff suffered a torn rotator cuff.  (Tr. 16-17.)

Plaintiff cites *Kalmbach v. Commissioner of Social Security*, 409 F. App'x 852 (6th Cir. 2011), in support of her contention that the ALJ erroneously failed to consider her fibromyalgia in his step two analysis and deem it a severe impairment. *Kalmbach*, however, is inapposite.[6]  The Sixth Circuit ordered a remand in *Kalmbach* because the claimant's treating physicians opined that the claimant's fibromyalgia caused significant limitations, and the ALJ failed to give good reasons for rejecting the treating physicians' opinions. *Id.* at 860-62.  Here, in contrast, Plaintiff provided no basis to conclude that the ALJ improperly assessed Dr. Lefkovitz's opinions, or that her fibromyalgia should have been deemed a severe impairment.

Plaintiff further argues that the ALJ's failure to discuss her fibromyalgia at step two was harmful because it caused the ALJ to fail to consider Plaintiff's fibromyalgia at every subsequent step of his analysis.  This contention is not supported by the record, which shows the ALJ *did* consider Plaintiff's fibromyalgia elsewhere in his opinion. Further, for the following reasons, any error in the ALJ's step two analysis would be

---

[6]  In *Kalmbach*, the ALJ recognized the claimant's diagnosis of fibromyalgia but neither identified it as a severe impairment nor explained why he believed it was not one. *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 859 (6th Cir. 2011).  The court believed that the ALJ's omissions were significant:

> That oversight is gaping given that [the claimant's] disability application is premised primarily upon the pain and fatigue she experiences as a result of her fibromyalgia, and in light of the fact that she was diagnosed with the condition by a specialist in rheumatology, and both the specialist and her primary care physician agreed that [the claimant's] fibromyalgia symptoms are the primary cause of her inability to engage in sustained work activity.  Moreover, this Circuit has expressly recognized that fibromyalgia can be a "severe impairment."

*Id.*

harmless error.

Although the determination of severity at the second step of a disability analysis is a *de minimis* hurdle in the disability determination process, *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988), the goal of the test is to screen out totally groundless claims, *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  Once an ALJ determines that a claimant suffers a severe impairment at step two of his analysis, the analysis proceeds to step three; accordingly, any failure to identify other impairments, or combinations of impairments, as severe would be only harmless error because step two would be cleared.  *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.").  All of a claimant's impairments, severe and not severe, must be considered at every subsequent step of the sequential evaluation process.  *See* 20 C.F.R. § 404.1545(e).

Here, the ALJ found at step two that Plaintiff suffered the following severe impairments:  degenerative changes and supraspinatous tendon degeneration in the right acromioclavicular joint (shoulder), and depression.  Upon the ALJ's finding of these severe impairments, Plaintiff cleared step two of the disability analysis.  *See Anthony*, 266 F. App'x at 457.

The ALJ did not discuss Plaintiff's fibromyalgia directly in his step three

19

assessment of whether Plaintiff's impairments, either singly or in combination, met or medically equaled an impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  Plaintiff, without any analysis, contends that the ALJ failed to consider her fibromyalgia in combination with her other impairments at step three as is required by the regulations.  But the ALJ stated that he found Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments," and explained that "no treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment."  (Tr. 13.) The ALJ was not required to explain every consideration that went into his step three determination.  *See* *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). Indeed, "[t]he mere failure to discuss every single impairment under the step three analysis is not a procedural error." *Id.*  Moreover, Plaintiff has not explained under which Listing the ALJ should have discussed her fibromyalgia directly, and whether the evidence supports the conclusion that she met or medically equaled that Listing.  In short, Plaintiff has presented an insufficient basis to support the conclusion that the ALJ failed to consider her fibromyalgia in combination with her other impairments and that this had any effect on the outcome of the ALJ's decision.  *See* *Bledsoe*, 165 F. App'x at 411 ("The ALJ made a finding that 'the medical evidence establishes that the claimant has 'severe' impairments . . . but that she does not have an impairment or combination of impairments listed in, or medically equal to the one[s] listed . . . .  The ALJ also made specific factual findings about the credibility of witnesses and expert reports.  These findings show the ALJ did consider whether a combination of all Bledsoe's impairments was medically equal [to] a 'listed impairment,' and is supported by substantial

20

evidence.") (internal citation omitted).[7]

Furthermore, the ALJ considered Plaintiff's fibromyalgia in his residual functional capacity ("RFC") assessment—Plaintiff attributed her shoulder pain, neck pain, and difficulty walking in part to her fibromyalgia, and the ALJ thoroughly discussed the evidence relating to these symptoms.  Accordingly, any defect in the ALJ's assessment of Plaintiff's fibromyalgia at step two would be, at most, harmless error and not a basis for remand.  See *Anthony*, 266 F. App'x at 457 (citing *Maziars*, 837 F.2d at 244); *Pompa*, 73 F. App'x at 803.

Finally, and again without any analysis, Plaintiff contends that the ALJ erred by failing to discuss Dr. Raynor's opinions, and that the ALJ's hypothetical to the VE does not accurately portray Plaintiff's limitations because it did not include limitations based on Plaintiff's fibromyalgia.  These contentions also are not well taken.  It is well settled that an ALJ can consider all the evidence without directly addressing in his written

---

[7] In her Reply Brief, Plaintiff contends for the first time that even if the ALJ tacitly found Plaintiff's fibromyalgia a non-severe impairment at step two, the ALJ still erred by failing to discuss Plaintiff's fibromyalgia at step three.  (Pl.'s Br. 2-3.)  Plaintiff is cautioned that substantive arguments should not be presented for the first time in a Reply Brief, as such untimely arguments may be deemed waived.  See *United States v. Moore*, 376 F.3d 570, 576 (6th Cir. 2004) (declining to consider issues not raised in the appellant's opening brief); *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1007 (6th Cir. 2009) ("These waiver and forfeiture rules ensure fair and evenhanded litigation by requiring parties to disclose legal theories early enough in the case to give an opposing party time not only to respond but also to develop an adequate factual record supporting their side of the dispute.").  Nevertheless, in addition to being waived, this argument lacks merit because, as the Court has already explained, Plaintiff has provided an insufficient basis to conclude that the ALJ failed to consider whether her fibromyalgia, either singly or in combination, met or medically equaled an impairment in the Listings and that this affected the outcome of the ALJ's decision.

decision every piece of evidence submitted by a party.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (per curiam) (quoting *Loral Def. Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir.1999)).  Further, an ALJ need not make explicit credibility findings as to each bit of conflicting testimony so long as his factual findings as a whole show that he implicitly resolved such conflicts. *Id.*  Dr. Raynor's opinions relating to Plaintiff's fibromyalgia consist only of a diagnosis, and the ALJ recognized that diagnosis, albeit implicitly, through his observation that Plaintiff alleged she suffered fibromyalgia and by assessing Dr. Lefkovitz's opinions that were based in part on Plaintiff's fibromyalgia.  As the ALJ considered both Plaintiff's diagnosis of fibromyalgia and the limitations caused therefrom in his RFC assessment, Plaintiff's contention that the ALJ's hypothetical did not accurately portray Plaintiff's limitations is unsupported by the record and lacks merit.

## VI.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  March 13, 2012


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of this notice.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**